UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER CARRUTH,<br><br>Plaintiff,<br><br>v.<br><br>KD CREATIVES, INC. D/B/A BIG LITTLE FEELINGS,<br><br>Defendant. | No. 2:24-cv-02484-DAD-SCR<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION<br><br>(Doc. No. 10) |

This matter is before the court on defendant's motion to compel arbitration. (Doc. No. 10.) On January 21, 2025, the pending motion was taken under submission on the papers. (Doc. No. 19.) For the reasons explained below, the court will deny defendant's motion.

**BACKGROUND**

On September 12, 2024, plaintiff, Jennifer Carruth, filed her operative putative class action complaint against defendant, KD Creatives, Inc, dba Big Little Feelings. (Doc. No. 1.) In that complaint, plaintiff alleges the following.

Defendant knowingly sold, transmitted, or disclosed records containing its customers' personal information to third parties. (*Id.* at ¶ 1.) Specifically, defendant installed programming code called the "Meta Pixel" onto its website, biglittlefeelings.com, which transmitted each customers' Facebook profile and purchases from defendant's website to Meta. (*Id.* at ¶¶ 2–3.)

1

1  On January 10, 2023, plaintiff purchased pre-recorded videos from defendant's website, and
2  defendant subsequently disclosed her Facebook profile and purchase information to Meta via the
3  Meta Pixel.  (*Id.* at ¶¶ 9–11.)
4  Based on these allegations, plaintiff asserts one claim under federal law:  violation of the
5  Video Privacy Protection Act ("VPPA").  (*Id.* at ¶¶ 65–75.)
6  Defendant moves to compel arbitration of plaintiff's claim on the grounds of two
7  purported arbitration agreements:  (1) the terms of service disclosed on the checkout page of
8  defendant's website when plaintiff made her purchase ("Checkout Agreement"); and (2) the terms
9  and conditions disclosed in two separate emails that defendant sent to plaintiff after she made her
10  purchase ("Email Agreement").  (Doc. No. 10 at 11.)
11  Defendant filed its motion to compel arbitration on December 6, 2024.  (*Id.*)  Plaintiff
12  filed her opposition on January 8, 2025. (Doc. No 16.)  Defendant filed its reply thereto on
13  January 17, 2025.  (Doc. No. 18.)

14  **LEGAL STANDARD**

15  A written provision in any contract evidencing a transaction involving commerce to settle
16  a dispute by arbitration is subject to the Federal Arbitration Act ("FAA").  9 U.S.C. § 2.  There is
17  generally a "liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 584
18  U.S. 497, 505 (2018) (internal quotation marks and citations omitted).  The FAA confers on the
19  parties involved the right to obtain an order directing that arbitration proceed in the manner
20  provided for in a contract between them.  9 U.S.C. § 4.  In considering a motion to compel
21  arbitration, the "court's role under the [FAA] . . . is limited to determining (1) whether a valid
22  agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at
23  issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).
24  The party seeking to compel arbitration bears the burden of proving by a preponderance of
25  the evidence the existence of an agreement to arbitrate. *Godun v. JustAnswer LLC*, 135 F.4th
26  699, 708 (9th Cir. 2025); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir.
27  2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v.
28  Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996)).  "When deciding a motion to compel

1  arbitration, a district court must treat the facts as they would when ruling on a motion for
2  summary judgment, construing all facts and reasonable inferences that can be drawn from those
3  facts in a light most favorable to the non-moving party." *Turner v. Tesla, Inc.*, 686 F. Supp. 3d
4  917, 922 (N.D. Cal. 2023) (internal quotation marks and citation omitted); *see also Hansen v.*
5  *LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) ("The summary judgment standard is
6  appropriate because the district court's order compelling arbitration is in effect a summary
7  disposition of the issue of whether or not there had been a meeting of the minds on the agreement
8  to arbitrate.") (internal quotation marks and citation omitted).

## ANALYSIS

In its pending motion, defendant argues that plaintiff must be compelled to arbitrate her VPPA claim on the basis of two separate agreements: (1) the Checkout Agreement; and (2) the Email Agreement. (Doc. No. 10 at 11.) The court will address both of defendant's arguments below.

**A.      The Checkout Agreement**

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "[E]lemental principles of contract formation apply with equal force to contracts formed online." *Id.* at 855–56. Here, the parties do not dispute that California contract law governs. (Doc. Nos. 10 at 9; 16.)

The Ninth Circuit recently summarized the law regarding the formation of internet contracts under California law:

> "To form a contract under California . . . law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." . . . A party may manifest assent through conduct. To do so, the party must intend the conduct and know, or have reason to know, the other party may infer her assent from the conduct.
>
> In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different "assent" mechanisms. In a browsewrap, the "user accepts a website's terms of use merely by browsing the site," although those terms are not always immediately apparent on

> the screen. Courts consistently decline to enforce browsewraps. In a clickwrap, the website presents its terms of use in a "pop-up screen" and the user accepts those terms by clicking or checking a box stating she agrees. Courts routinely enforce clickwraps. In a scrollwrap, which provides "the strongest notice" and are usually enforced, the user must scroll through all the terms before the website allows her to click a box to agree. Finally, a sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms.

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (internal citations omitted). Defendant contends, and plaintiff does not dispute, that the Checkout Agreement constitutes a browsewrap agreement. (Doc. Nos. 10 at 9; 16.) Nonetheless, as explained below, the court concludes that the Checkout Agreement is more akin to a sign-in wrap agreement.

First, the Checkout Agreement explicitly states: "By placing your order, you agree to our Terms of Service and Privacy Policy." (Doc. No. 10-1 at 2.) It has been recognized that "[s]ign-in wrap agreements include a textual notice that a user will be bound by the terms of use . . . . by placing an order[.]" *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285, 1294 (E.D. Cal. 2024) (citing *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 471 (2021)). Thus, users are only bound by the Checkout Agreement once they purchase videos from defendant's website. Indeed, the notice "indicates that some action," here, placing an order on defendant's website, binds users to the Checkout Agreement even if they do not review the terms of that agreement. *See Chabolla*, 129 F.4th at 1154. This differs from a pure browsewrap agreement where the user assents to a "website's terms of use merely by browsing the site." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citing *Sellers*, 73 Cal. App. 5th at 463). Therefore, the Checkout Agreement is not a pure browsewrap agreement. Accordingly, the court will apply the sign-in wrap agreement framework.

Defendant contends that plaintiff had only inquiry, not actual, notice of the Checkout Agreement. (Doc. No. 10 at 9.) Where, as here, the website operator proceeds on an inquiry notice theory to prove the user's assent, they must show that: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

/////

4

1 consumer takes some action, such as clicking a button or checking a box, that unambiguously

2 manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (citation omitted).

### 1.     Whether the Notice Was Reasonably Conspicuous

Defendant argues that plaintiff received inquiry notice of the Checkout Agreement when she purchased videos from defendant's website on January 10, 2023. (Doc. No. 10 at 11.) Specifically, defendant contends that "[w]hen Plaintiff made her purchase, Plaintiff was presented with the following text immediately below the 'Checkout' button: 'By placing your order, you agree to our Terms of Service and Privacy Policy.'" (*Id.* at 3.) Both of the underlined terms were "hyperlinked to BLF's Terms of Service and Privacy Policy, respectively." (*Id.* at 3–4; Doc. No. 10-1 at 2.) In support of its argument, defendant submits a sworn declaration from Lisa Carll ("Carll"), director of business operations for defendant, which includes a cropped screenshot of how the website displayed the Checkout Agreement in mobile format when plaintiff made her purchase in 2023. (Doc. No. 10-1 at 2.)

In her opposition, plaintiff disputes where the Checkout Agreement was located on defendant's website when she completed her purchase. (Doc. No. 16 at 8.) She insists that users "would have had to scroll down on the screen past the 'Checkout' button to reveal" the Checkout Agreement. (*Id.*) Plaintiff further argues that, even if the Checkout Agreement was located directly below the checkout button, it falls short of reasonable conspicuousness. (*Id.*) In support of these contentions, plaintiff submits screenshots taken by her attorney, Frank Hedin, on his mobile device displaying what the checkout page looked like in January 2025. (Doc. Nos. 16-4 at 2; 16-5 at 2.)[1]

When analyzing whether notice was reasonably conspicuous, courts "must look to both 'the context of the transaction' and the 'placement of the notice.'" *Keebaugh*, 100 F.4th at 1019-

---

[1] Defendant raises several objections to this evidence on both relevance and best evidence rule grounds. (Doc. No. 18-2.) However, the court need not rule on these objections because it will resolve the pending motion without reference to plaintiff's evidence. *See Rose v. Humana Ins. Co.*, No. 17-cv-08107-PCT-DGC, 2018 WL 888982, at *3 (D. Ariz. Feb. 14, 2018) (finding that even if an evidentiary objection was resolved in the defendant's favor the defendant had not carried its burden of establishing a valid arbitration agreement).

5

1   20. Ultimately, "the onus must be on website owners to put users on notice of the terms to which
2   they wish to bind consumers." *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d
3   1089, 1095 (C.D. Cal. 2023) (internal quotation marks and citation omitted).

          a.     *Context of the Transaction*

When analyzing the context of the transaction, courts consider whether the reasonable user "contemplates entering into a forward-looking relationship that would be governed by terms and conditions." *Godun*, 135 F.4th at 710 (internal quotation marks and citation omitted). Consumers generally contemplate an ongoing relationship in transactions where they sign up for an account with a website or download an app to their phone for continued access to the content at their discretion. *Keebaugh*, 100 F.4th at 1020. In contrast, consumers typically do not anticipate an ongoing contractual relationship after a one-time purchase without more. *Sarhadi v. Pear Health Labs, Inc.*, No. 24-cv-07921-TLT, 2025 WL 1350033, at *5 (N.D. Cal. Apr. 18, 2025); *Sellers*, 73 Cal. App. 5th at 476 ("[I]t is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them.").

Defendant contends that "given the context of the transaction, Plaintiff should have been aware that her relationship with BLF would be governed by some terms of service." (Doc. No. 18 at 9.) In support of its argument, defendant cites to a district court decision in which a plaintiff brought a claim for violation of the VPPA after purchasing pre-recorded videos from the defendant's website. (Doc. Nos. 10 at 10–11; 18 at 9–10) (citing *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911 (N.D. Cal. 2024)). In that case, the district court concluded that the context of the transaction supported a finding of reasonable conspicuousness because a user who signed up "for Coursera necessarily anticipates ongoing access to [Coursera] at the user's discretion in order to continue viewing the pre-recorded videos." *Ghazizadeh*, 737 F. Supp. 3d at 925 (alteration in original) (internal quotation marks and citation omitted). The court finds the decision in *Ghazizadeh* to be instructive.

/////

1  Just as in *Ghazizadeh,* here, the user's relationship with defendant necessarily continues
2  after the initial purchase because in order to access the videos a user purchases from defendant's
3  website, one must create and log in to an account associated with the platform. (Doc. No. 10-1 at
4  3.) Certainly the user who registers an account to later access content "as opposed to a one-time
5  purchase, is more likely to expect a continuing relationship that would put her on notice for a link
6  to the terms of that continuing relationship." *Ghazizadeh*, 737 F. Supp. 3d. at 925.

7  Thus, the court concludes that the context of the transaction in this case supports a finding
8  that the Checkout Agreement was reasonably conspicuous. Nonetheless, "the context of the
9  transaction is a non-dispositive factor under California law, used to evaluate whether a website's
10 notice is sufficiently conspicuous." *Keebaugh*, 100 F.4th at 1019. "Courts must still evaluate the
11 visual aspects of the notice" to evaluate whether it is reasonably conspicuous. *Id.* (citation
12 omitted).

                b.      *Visual Design of the Webpage*

14 As outlined above, Carll's declaration includes a cropped screenshot of the checkout page
15 in mobile format as it existed in 2023. (Doc. No. 10-1 at 2.) The image displays the word
16 "Checkout" in white font, embedded within a black rectangular box. (*Id.*) Directly below that
17 box, in smaller and all black font, appears language reading: "By placing your order, you agree
18 to our Terms of Service and Privacy Policy." (*Id.*) The underlined phrase "Terms of Service" is
19 hyperlinked to defendant's arbitration agreement. (*Id.*) A light grey background sits behind both
20 elements. (*Id.*) Plaintiff argues that this notice falls short of reasonable conspicuousness because
21 of "the presentation of the statement below the button—in small black font (much smaller than
22 the surrounding text, much of which is in bold) against a greyscale background, and dwarfed by
23 the large 'Checkout' button." (*See* Doc. No. 16 at 23).[2] The court agrees, as explained below.

---

[2] Plaintiff asserts that defendant is arguing that she placed her order using a desktop device. (Doc. No. 16 at 7–8.) This is not the case. Defendant clearly acknowledges that plaintiff made her purchase using a mobile device. (*See* Doc. No. 10-1 at 2) ("BLFs' records reflect that on January 10, 2023, while logged into her Facebook account *on a mobile device*, Plaintiff Jennifer Carruth ("Plaintiff") clicked on an advertisement for BLF's courses. After Plaintiff clicked on the Facebook advertisement, she was routed to BLF's website, where she then purchased a bundle of courses from BLF.") (emphasis added).

7

When analyzing the visual aspects of a webpage, courts consider whether the notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Keebaugh*, 100 F.4th at 1014 (internal quotation marks and citation omitted). Under this analysis, courts consider several factors including:

> (1) the size of the text; (2) the color of the text as compared to the background it appears against; (3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; (4) the obviousness of any associated hyperlink; and (5) whether other elements on the screen clutter or otherwise obscure the text.

*Cavanaugh*, 738 F. Supp. 3d at 1295 (internal quotation marks and citation omitted).

Still, the Ninth Circuit has recognized as follows:

> But we have not created a checklist for website designers. Nor have we generated per se design rules that must be followed for a contract to be formed between a website user and provider. "[T]here is no bright-line test for finding that a particular design element is adequate in every circumstance." *Chabolla*, 129 F.4th at 1156–57. And, by the same logic, there are not per se rules about what's necessarily inadequate, either. Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis. Barring changes to state-law doctrines regarding internet contract formation, any suggestion that hard-and-fast rules constrain this inquiry results from over-reading or misreading our precedent.
>
> Importantly—again, at least under California law— "even minor differences" in the design elements may make the difference in this fact-intensive analysis. *Sellers*, 73 Cal. App. 5th at 481, 289 Cal.Rptr.3d 1. At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user. *See id.* at 471, 483, 289 Cal.Rptr.3d 1. A hefty dose of common sense goes a long way.

*Godun*, 135 F.4th at 710.

Here, despite appearing directly below the checkout box, the Checkout Agreement is in relatively smaller text than the action button directly above it. (Doc. No. 10-1 at 2.) This is of some significance. *See Godun*, 135 F.4th at 711 (noting that the "advisal text is printed in relatively small text" in ruling that the sign-in wrap agreement lacked reasonable conspicuousness). Additionally, the black text imposed upon the grey background further detracts from its conspicuousness. *Compare Rocha v. Urban Outfitters, Inc.*, No. 23-cv-00542-

8

AMO, 2024 WL 393486, at *4 (N.D. Cal. Feb. 1, 2024) (concluding that the grey text appearing against a white background in that case was insufficiently conspicuous), *with Keebaugh*, 100 F.4th at 1020–21 (finding notice appearing in "a contrasting white font" against a dark background to be conspicuous), *and Perry-Hudson v. Twilio, Inc.*, No. 24-cv-03741-VC, 2024 WL 4933332, at *1 (N.D. Cal. Dec. 2, 2024) (holding that black font against a plain white background is sufficiently conspicuous).

Furthermore, the text that hyperlinks to the Checkout Agreement is in the same font color "as the rest of the sentence" in which it sits rather than another contrasting color to indicate the presence of a hyperlink. *Berman*, 30 F.4th at 854; *see also Hooper v. Jerry Ins. Agency, LLC*, 675 F. Supp. 3d 1027, 1036 (N.D. Cal. 2023) ("Jerry's 'Terms of Use' hyperlink appears in bright pink font, in contrast to the surrounding gray font . . . . This is sufficient to 'set apart' the hyperlink from the rest of the text.") (internal citations omitted).

Beyond proximity to the action button, the only other signifiers that the Checkout Agreement is hyperlinked are underlining and capitalization of the first letter of the words "Terms" and "Service." (Doc. No. 10-1 at 2.) Otherwise, the Checkout Agreement lacks other traditional hyperlink characteristics such as "the use of a contrasting font color (typically blue) and the use of all capital letters." *Berman*, 30 F.4th at 857; *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (holding that a sign-in wrap agreement provided inquiry notice since "crucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent"); *Gill v. Chipotle Mexican Grill, Inc.*, 24-cv-01672-FWS-JDE, 2025 WL 287320, at *5 (C.D. Cal. Jan. 23, 2025) ("[T]he hyperlinks are in the same or very similar shade of brown typeface as the rest of the surrounding text, making it not sufficiently clear that the text is a hyperlink.").

Another district court has recently held that a sign-in wrap which capitalized the first letters of a hyperlink was reasonably conspicuous. *See Kroskey v. Elevate Labs, LLC*, No. 24-cv-08113-EJD, 2025 WL 1507091, at *4 (N.D. Cal. May 27, 2025). However, the notice at issue in that case possessed additional elements of conspicuousness that are absent here. *Id.* (finding reasonable conspicuousness because the hyperlink was bolded with the first letters capitalized, the

9

font appeared clearly against the background, it was set off by ample white spacing, it was not otherwise buried, and the website lacked clutter). In contrast, one district court analyzing identical signifiers as those present in the instant action rejected the sign-in wrap agreement as insufficiently conspicuous. *Cavanaugh*, 738 F. Supp. 3d at 1296. There, as here, the hyperlinked text was underlined, displayed directly below the action button, and the first letters were capitalized. *Id.* at 1292.

Defendant argues that merely underlining the Checkout Agreement is sufficiently conspicuous notice. (Doc. No. 18 at 12–13) (citing *Pizarro v. QuinStreet, Inc.*, No. 22-cv-02803-MMC, 2022 WL 3357838, (N.D. Cal. Aug. 15, 2022)). It is true that the court in the case relied upon by defendant did conclude that an agreement was sufficiently conspicuous where the terms of service were underlined despite the fact that the terms of service were in the same font color as the surrounding text. *See Pizarro*, 2022 WL 3357838, at *3. The district court in *Pizarro* reasoned that, while the hyperlink was underlined and in the same color as the surrounding text, "the notice and hyperlink appear[ed] directly below the 'See My Rates' button, [were] set off by ample white spacing, and [were] primarily surrounded by text no larger than the notice itself." *Id.* These characteristics relied upon by the court in *Pizarro* distinguish it from the present case.

First, as described above, Carll's declaration merely presents a cropped screenshot of the checkout page.[3] (Doc. No. 10-1 at 2.) Thus, the only reference point about the surrounding text size is the sentence in which the Checkout Agreement appears and the larger word "Checkout" within a black box immediately above it. (*Id.*) Based on that evidence alone, it is unclear whether the Checkout Agreement is primarily surrounded by larger text. Moreover, the Checkout Agreement is not set off by ample spacing. (*Id.*) In fact, it is sandwiched between the bottom of the cropped image and the checkout button. (*Id.*) The only remaining similarity between *Pizarro*

---

[3] With its reply, defendant has submitted the declaration of its counsel, Starr Drum ("Drum"). (Doc. No. 18-1.) That declaration includes a screenshot displaying Drum's experience on a mobile device when she navigated to the checkout screen on January 10, 2025. (*Id.* at 2.) However, as defendant acknowledges, depictions of its "website on a mobile device in 2025 are irrelevant and have no bearing on what Plaintiff, the actual putative class representative, saw during the actual class period." (Doc. No. 18-2 at 2) (emphasis omitted). Accordingly, the court declines to consider this evidence.

and this case is that the notices in both cases are underlined and appear directly below the most important action button on the screen. Another district court has specifically determined that the presence of these elements alone is not a sufficient basis upon which to find reasonable conspicuousness. *Cavanaugh*, 738 F. Supp. 3d at 1296.

Furthermore, the Ninth Circuit has specifically rejected defendant's contention that mere underlining is sufficiently conspicuous notice. *Berman*, 30 F.4th at 857 ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text.") (citation omitted). As the district court in *Cavanaugh* has explained:

> Numerous cases have found mere underlining of a hyperlink to be insufficient. In *Berman*, for example, the Ninth Circuit, applying California law, held that "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent," and concluded that a "web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text." 30 F.4th at 857. The *Berman* court rejected as inconspicuous hyperlinks that were underlined but did not include other "customary" design elements for hyperlinks, such as "use of a contrasting . . . color" or "all capital letters," that would have alerted users that the text was clickable. *Id.* In contrast, hyperlinks that are presented in a contrasting color may be sufficiently conspicuous. . . . In the absence of any evidence demonstrating that website design practices and public understanding of them have shifted, the Court will not depart from the overall trend that finds hyperlinks must be offset in a more obvious way than the underlining used on the Fanatics sign-up page at issue in this case.

738 F. Supp. 3d at 1296.

Finally, the Ninth Circuit has decided sign-in wrap cases since *Pizarro,* the decision upon which defendant relies in support of its argument. In none of those cases has the court held or suggested that underlining and proximity to an action button, without more, satisfy the visual aspects of the website analysis for sign-in wrap agreements. *See, e.g.*, *Oberstein*, 60 F.4th at 518 (upholding a sign-in wrap agreement on the basis of the color, placement, language, and repetition of notices); *Keebaugh*, 100 F.4th at 1020–21 (upholding a sign-in wrap agreement based on the notice's placement, language, font color, and overall design of the app).

/////

11

1  In sum, considering both the context of the transaction and the visual design of the webpage, the court concludes that the Checkout Agreement in this case falls short of the reasonable conspicuousness standard. *See Cavanaugh*, 738 F. Supp. 3d at 1296 (finding a sign-in wrap agreement that was underlined, displayed directly below the action button, where the first letters were capitalized, and where plaintiff had reason to expect an ongoing relationship to be insufficiently conspicuous). Accordingly, the court will deny defendant's motion to compel arbitration to the extent it is based upon the Checkout Agreement.[4]

**B.   The Email Agreement**

Defendant alternatively argues that the Email Agreement placed plaintiff on inquiry notice of the arbitration agreement. (Doc. No. 10 at 11.) In Carll's declaration, she states that defendant "sent Plaintiff an email with a receipt of her purchase" and "[t]hat email stated that Plaintiff would receive a separate email inviting her to set up an account in order to start her course." (Doc. No. 10-1 at 3.) Defendant further contends that it subsequently sent plaintiff "two separate emails providing the login link for her course." (Doc. No. 10 at 11.) According to Carll's declaration, in both emails, immediately below the login link, appeared the following notice: "By logging in, you agree to our Terms of Service and Privacy Policy." (Doc. No. 10-1 at 3.)

In her opposition, plaintiff argues that she never received the emails defendant submits as evidence in support of its motion. (Doc. No. 16 at 27.) In support of her argument, plaintiff submits three screenshots of emails that defendant sent her after she completed her purchase. (Doc. No. 16-1 at 5, 7, 9.) Plaintiff contends that these screenshots reflect the only emails she received after placing her order. (*Id.* at 2.)

---

[4] Since the Checkout Agreement falls short of reasonable conspicuousness, plaintiff's click of the checkout button could not constitute unambiguous manifestation of assent to the arbitration agreement. *See e.g.*, *Dawson v. Target Corp.*, 24-cv-08167-AMO, 2025 WL 1651940, at *4 (N.D. Cal. June 11, 2025) ("At bottom, Target's proffered screens do not confer reasonable notice of arbitration, and thus, any action the user takes on the page[s] cannot unambiguously manifest [his] assent to those terms.") (alteration in original) (internal quotation marks and citation omitted); *see also Gill*, 2025 WL 287320, at *5 (concluding that plaintiff did not unambiguously manifest their assent because the notice of an arbitration agreement was not reasonably conspicuous); *Rocha*, 2024 WL 393486, at *5 ("Because Rocha did not have inquiry notice of the arbitration agreement, she did not manifest assent to its terms and is not bound by the Urban Outfitters arbitration agreement.")

The court need not resolve the parties' factual dispute in this regard because defendant has failed to offer any evidence that any part of the email that it asserts was sent to plaintiff contains a hyperlink to the purported arbitration agreement. (*See* Doc. No. 10-1.) Thus, defendant has failed to carry its burden of establishing that notice *of the arbitration agreement* was reasonably conspicuous. *See Plata v. Lands' End, Inc.*, No. 24-cv-00723-MEMF-SP, 2024 WL 5339858, at *6 (C.D. Cal. Dec. 19, 2024) ("Even if this Court found the Link 1 notice to be reasonably conspicuous, because Lands' End has not carried its burden to show that Link 1 led directly to the Terms of Use, the notice and the Terms of Use, taken as a whole, are not reasonably conspicuous."), *aff'd*, No. 25-328, 2025 WL 2408818 (9th Cir. 2025).

Therefore, defendant's motion to compel arbitration based upon the Email Agreement will also be denied.

## CONCLUSION

For the reasons explained above,

1. Defendant's motion to compel arbitration (Doc. No. 10) is DENIED in its entirety; and

2. The court hereby RESETS the Initial Scheduling Conference in this matter for November 10, 2025 at 1:30 p.m. before District Judge Dale A. Drozd by Zoom.

IT IS SO ORDERED.

Dated: **September 10, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE